NUMED, INC., Appellant,

v.

**Dennis McNUTT, Individually, and d/b/a Texas Imaging Consultants, Medical Systems Division, Appellee.**

No. 2–86–131–CV.

Court of Appeals of Texas, Fort Worth.

Feb. 5, 1987.

Rehearing Denied March 5, 1987.

Vernon, McKinley, Dubner & Schutza, P.C. and Ronald A. Dubner and Pamela R. Tepper, Dallas, for appellant.

L.A. Nelson, Denton, for appellee.

Before FENDER, C.J., and BURDOCK and HILL, JJ.

## OPINION

BURDOCK, Justice.

This is an appeal from the denial of a temporary injunction appellant, Numed, Inc., sought to prevent appellee, Dennis McNutt, d/b/a Texas Imaging Consultants, Medical Systems Division, a former employee, from competing with Numed. On appeal, Numed alleges the trial court erred and abused its discretion in denying its application for a temporary injunction. We affirm.

Numed is a Texas corporation primarily engaged in selling and leasing diagnostic imaging equipment to Texas hospitals, and providing technologists to operate the equipment. Through its pharmacies, Numed also sells certain radioactive materials used in the operation of its equipment.

Numed hired McNutt in 1976 as a technician. By the time he left Numed in January of 1986, McNutt had risen to the rank of vice-president. As such, he was active in and familiar with all of Numed's business activities.

In February of 1986, McNutt, then in business for himself, submitted a proposal to a Denton County hospital for services it was receiving from Numed. Numed sought a temporary and permanent injunction, as well as damages and attorney's fees from McNutt. The trial court, after a hearing on the temporary injunction, denied the requested relief.

In its point of error, Numed advances the following contentions: (1) because McNutt was a vice-president of Numed, a fiduciary relationship exists between McNutt and Numed; (2) McNutt breached that fiduciary relationship by using information gained while employed at Numed to form a competing company; (3) the information McNutt obtained while at Numed consisted

of customer lists, contract renewal dates, price lists, and marketing research which was confidential in nature and constituted trade secrets; and, (4) McNutt used Numed's confidential, proprietary, and trade secret information to obtain an unfair advantage over Numed in the marketplace.

■ The general rule is that confidential information received during the course of fiduciary relationships may not be used or disclosed to the detriment of the one from whom the information is obtained. *Welex Jet Services, Inc. v. Owen,* 325 S.W.2d 856, 858 (Tex.Civ.App.—Fort Worth 1959, writ ref'd n.r.e.). During employment and after termination, an employee is obligated not to divulge his employer's trade secrets. *Johnston v. American Speedreading Academy, Inc.,* 526 S.W.2d 163, 166 (Tex.Civ.App.—Dallas 1975, no writ). These general rules apply even when, as here, the use or disclosure is not prohibited or restricted by an express contract. *Hyde Corporation v. Huffines,* 158 Tex. 566, 314 S.W.2d 763, 770 (1958); *Weed Eater, Inc. v. Dowling,* 562 S.W.2d 898, 901 (Tex.Civ.App.—Houston [1st Dist.] 1978, writ ref'd n.r.e.).

■ A former employee may, however, use the general knowledge, skills, and experience acquired during his prior employment to compete with a former employer and even do business with the former employer's customers, provided that such competition is fairly and legally conducted. *Expo Chemical Co., Inc. v. Brooks,* 572 S.W.2d 8 (Tex.Civ.App.—Houston [1st Dist.] 1978), *rev'd on other grounds,* 576 S.W.2d 369 (Tex.1979). Unfair competition may manifest itself in numerous acts or courses of conduct. However, between an employee and his former employer it generally consists of the competitive use of confidential information or the representation of the employer's product as that of the former employee. *See generally: K & G Oil Tool & Service Co. v. G & G Fishing Tool Serv.,* 158 Tex. 594, 314 S.W.2d 782 (1958); *Marshall Mfg. Co. v. Verhalen,* 163 S.W.2d 665 (Tex.Civ.App.—Dallas 1942, writ ref'd w.o.m.).

We agree with Numed's position that as a vice-president of Numed, McNutt owed a fiduciary duty to the corporation. *International Bankers Life Ins. Co. v. Holloway,* 368 S.W.2d 567, 576 (Tex.1963). The undisputed testimony shows Numed's President, Ed Menkemeller, started the company in 1974. With McNutt's help, the firm became a strong competitor in the field of non-invasive imaging. In his capacity as an officer of Numed, McNutt did extensive work formulating pricing and procedural systems for use with Numed's customers. Testimony revealed he maintained close contacts with potential customers in the industry, and possessed a detailed knowledge of Numed's marketing techniques.

McNutt testified he began to feel isolated from the decision-making process at Numed in 1984, and resigned his position in January, 1986. Immediately after his resignation, McNutt formed Texas Imaging Consultants. There is no evidence McNutt had signed a non-competition agreement with Numed. Within a month of starting his new firm, McNutt, representing his company, called on a Numed customer with a proposal for non-invasion services at a price lower than that charged by Numed for similar services.

The evidence reveals Numed made no effort to keep its information secret from McNutt until 1985. Prior to September of 1985, McNutt had access to Numed's records.

Furthermore, Numed's customers received copies of the contracts they entered into with Numed for its services. These contracts contained the price charged for the service, the procedure furnished, and the expiration date of the contract. Testimony showed most contracts could be terminated by either party after giving 30 to 90 days written notice.

There is no evidence McNutt took or copied any of Numed's information upon termination of his employment. McNutt testified the source of all the information included in his firm's proposal to a hospital in Denton County was his knowledge of materials and procedures he had obtained while working in the industry.

Bruce Hammond testified he represented another competitor of Numed's. Hammond maintained Numed's customer lists and those of other competitors could be compiled by calling doctors and hospital administrators, and asking for the name of their supplier. On one occasion, a hospital administrator had even told Hammond what Numed charged his facility for its services. According to Hammond, information about Numed's customers, prices, and services were generally known in the industry. He stated he could think of no marketing technique employed by Numed that would give it a competitive advantage over his company. A reading of the record clearly shows the skills acquired by McNutt during his tenure at Numed, which he later used to market his own product, were derived from his own expertise, not the property of Numed.

Nevertheless, it is argued that the information McNutt was exposed to while in Numed's employ should be protected as a trade secret, since the use of that information by McNutt would give him an unfair trade advantage over Numed.

Numed relies on the RESTATEMENT (FIRST) OF TORTS, sec. 757 for the proposition that the information McNutt learned while vice-president at Numed is a trade secret. A trade secret is defined as follows:

> A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers.... trade secret is a process or device for continuous use in the operation of the business.

RESTATEMENT (FIRST) OF TORTS, sec. 757 (1939).

Numed alleges its pricing structure, marketing research, customer lists, and renewal dates fall within the definition of a trade secret, and are thus entitled to protection by injunction. The following conditional language in the definition, "[a trade secret] may be ... a list of customers," shows trade secret status does not automatically attach to such things as a customer list. *Allan J. Richardson v. Andrews,* 718 S.W.2d 833, 837 (Tex.App.—Houston [14th Dist.] 1986, no writ).

To be accorded the court's protection, proprietary information must be more than merely of a kind and character encompassed by the definition. *Id.* at 837. It must be information that is not publicly available or readily ascertainable by independent investigation. *SCM Corporation v. Triplett Company,* 399 S.W.2d 583, 586 (Tex.Civ.App.—San Antonio 1966, no writ).

Here, the facts do not justify conferring the status of trade secret on the data Numed claims requires protection. The evidence reflects much of the information Numed wishes to protect is not secret. Instead, it is contained in the contracts distributed to Numed's customers, which in turn may be discovered by anyone.

It is well-established that an appellate court may not reverse the trial court's granting or refusal of a temporary injunction in the absence of a clear abuse of discretion on the part of the trial court. *Lesikar Construction Company v. Parrish,* 469 S.W.2d 643, 644 (Tex.Civ.App.—Eastland 1971, no writ); *Mihailov v. City of Cedar Hill,* 453 S.W.2d 181, 184 (Tex. Civ.App.—Dallas 1970, no writ).

Abuse of discretion does not exist if the trial court bases its decision on conflicting evidence and the evidence reasonably supports its conclusion. *Davis v. Huey,* 571 S.W.2d 859, 862 (Tex.1978). We hold that the denial of the injunction was not an abuse of discretion.

The judgment is affirmed.